## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NATIONAL FUEL GAS DISTRIBUTION ）
CORPORATION ）
  *Plaintiff*, ）
     ）
v.      ）   No. 1:21-cv-254
     ）
THE CITY OF ERIE, ）
  *Defendant*. ）

## COMPLAINT

Plaintiff National Fuel Gas Distribution Corporation, by its attorneys at the Mizner Law Firm, files this Complaint and states as follows:

### I. INTRODUCTION.

National Fuel Gas Distribution Corporation ("**National Fuel**") is charged with the safe and efficient delivery of natural gas utility services to its customers, at rates which are independently set by the Pennsylvania Public Utility Commission ("**Commission**" or "**PUC**"). Pursuant to the Pennsylvania Public Utility Code (66 Pa.C.S. §§ 101, *et seq.*, the "**Utility Code**"), the PUC has the sole authority to set the rates National Fuel charges to its customers, and it allows National Fuel to recover its costs through these rates. The PUC also is vested with the exclusive authority to regulate the placement and safety of the facilities used by National Fuel in delivering natural gas to its customers (*i.e.*, pipelines, regulator stations, meters, etc.) (collectively, the "**Facilities**").

The City of Erie has repeatedly encroached on this statutory scheme and the authority of the PUC, by attempting to regulate where National Fuel builds and maintains its Facilities, and by charging unlawful and excessive fees. Despite repeated efforts by National Fuel to amicably resolve these matters collaboratively, the City of Erie has continued to both charge unlawful and excessive fees – approximately $1,300,000 from 2014 through 2020 – and to restrict the placement of National Fuel's Facilities.

Since the PUC approves rates which are applicable to National Fuel's entire Pennsylvania Service Territory, all of National Fuel's Pennsylvania ratepayers (whether located in the City of Erie or elsewhere) stand to bear the cost of these fees and municipal actions.  Consequently, as a last resort to protect all of its Pennsylvania ratepayers, National Fuel has filed this action to compel the City of Erie to abide by clearly established Pennsylvania law.

## II.    **PARTIES**

1.     Plaintiff, National Fuel Gas Distribution Corporation ("**National Fuel**") is a public utility corporation duly organized and existing under the laws of the State of New York with its headquarters located at 6363 Main Street, Williamsville, New York 14221.

2.     In compliance with the requirements of the Pennsylvania Business Corporation Law (15 Pa.C.S. §§ 101 *et seq*., the "**BCL**"), National Fuel has secured from the Commonwealth of Pennsylvania authority to do business within the Commonwealth of Pennsylvania as a foreign corporation.

3.     Defendant, City of Erie ("**City**" or "**City of Erie**") is a Pennsylvania Municipal Corporation, organized as a Third-Class City under Pennsylvania's Third-Class City Code (11

Pa.C.S. §§ 10101 *et seq*.), and having an address at 626 State Street, Suite #400, Erie, PA 16501.

### III.    JURISDICTION AND VENUE

4.    This action consists of both: (a) claims arising under the Constitution of the United States; and (b) claims arising under Pennsylvania state law.

5.    This action's federal claims include both: (a) a claim arising under the Takings Clause of the Fifth Amendment of the United States Constitution, as applied against the City of Erie pursuant to the Fourteenth Amendment; and (b) a claim arising under the Due Process Clause of the Fourteenth Amendment of the United States Constitution for deprivation of the Plaintiff's property interest without due process of law.

6.    These Constitutional claims are cognizable under federal law pursuant to 42 U.S.C. § 1983.

7.    This Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    As to the claims arising under state law, such claims are being filed in federal court based on the diverse state citizenship of the parties, with an amount in controversy in excess of $75,000.00.

9.    As such, this Court has jurisdiction over these state law claims pursuant to 28 U.S.C. § 1332.

10.    Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred

within the territorial jurisdiction of this District and the Defendant is subject to personal jurisdiction within this District.

IV.   **FACTS**

    A.   **National Fuel's Business and Operations.**

11.   National Fuel is engaged in the business of selling and distributing natural gas to retail customers within the Commonwealth of Pennsylvania and is, therefore, a "public utility" within the meaning of both Section 102 of the Utility Code (66 Pa. C.S. § 102) and Section 1511 of Pennsylvania's Business Corporation Law (15 Pa.C.S. § 1511) ("**Public Utility**").

12.   As a Public Utility, National Fuel is subject to the regulatory jurisdiction of the PUC.

13.   National Fuel currently provides natural gas service to approximately 200,000 retail customers in fourteen (14) counties in Northwest Pennsylvania ("**Service Territory**"), pursuant to certificates of public convenience granted by the PUC and National Fuel's tariff for the furnishing of gas service to its Pennsylvania Service Territory ("**Tariff**"), which is, in turn, filed with and approved by the PUC.

14.   The City of Erie is within National Fuel's Service Territory.

15.   In the City of Erie, as elsewhere throughout its Service Territory, National Fuel delivers natural gas to its customers through a vast, company-owned infrastructure system designed to move gas from high-pressure natural gas pipelines to the homes and offices of its customers. Generally speaking, National Fuel's infrastructure system consists of the following (collectively, "**Facilities**"):

a.  Natural gas pipelines ("**Pipelines**"), including high-pressure lines ("**Supply Lines**"), medium- and low-pressure distribution main lines ("**Main Lines**"), and smaller lines feeding homes and businesses ("**Service Lines**");

b.  Regulator Stations, which control and regulate the pressure of natural gas as it travels across Pipelines and from higher-pressure Pipelines to lower-pressure Pipelines;

c.  Meters, which measure the amount of natural gas consumed by customers; and

d.  Related infrastructure equipment.

16.     National Fuel, like other Public Utilities, generally places its Facilities in: (a) private rights-of-way ("**Private ROWs**"); and (b) in public rights-of-way ("**Public ROWs**").

17.     Generally speaking, Public ROWs consist of: (a) public streets and roadways ("**Cartways**"); and (b) that portion of land between the edge of the Cartway and the landowner's side of the sidewalk (the "**Utility Strip**").

18.     As a Public Utility, the placement of National Fuel's Facilities is based solely on the technical judgment of National Fuel, pursuant to and in compliance with the Utility Code and applicable regulations of the PUC (inclusive, and the provisions of its Tariff, which is, in turn, a utility regulation[1]) (as codified at Title 52 of the Pennsylvania Code, the "**PUC Regulations**").

19.     In this regard, the PUC's authority extends to: (a) the location, construction, and maintenance of National Fuel's Facilities; (b) provides for the only tariff that may be imposed upon it; and (c) specifies the means of the PUC's exclusive oversight of the Utility Code and

---

[1] *See, PPL Elec. Utils. Corp. v. City of Lancaster,* 214 A.3d 639, 642 (Pa. 2019).

regulatory compliance. *PPL Elec. Utils. Corp. v. City of Lancaster,* 214 A.3d 639, 642 (Pa. 2019).

20.      When the determination is made to place its Facilities in Private ROWs, National Fuel secures such rights pursuant to either: (a) contractual agreements (*e.g.*, easements or right-of-way agreements) with individual landowners; or (b) the exercise of its Eminent Domain powers (as authorized under provisions of the Utility Code and Section 1511 of the BCL, 15 Pa.C.S. § 1511).

21.      When the determination is made to place Facilities in the Public ROWs, however, Pennsylvania law expressly authorizes National Fuel to place its Facilities there without the need for any contractual arrangement.

22.      In this regard, Section 1511 of the BCL confers on National Fuel the vested property right to "enter upon and occupy streets, highways, waters and other public ways and places . . . for . . . purposes reasonably necessary or appropriate for the accomplishment of the principal purposes, including the placement, maintenance and removal of aerial, surface and subsurface public utility facilities thereon or therein." 15 Pa.C.S. § 1511(e).

   **B.      National Fuel's Status as a PUC-Jurisdictional Entity.**

23.      As described above, National Fuel operates as a Public Utility and has been issued a Certificate of Public Convenience from the PUC which entitles it to transport and deliver natural gas to customers within its Service Territory (which includes the City of Erie) under and subject to the regulatory jurisdiction of the PUC and the provisions of the Utility Code.

24.     This is significant, because the Pennsylvania Supreme Court has repeatedly confirmed that the Utility Code "occupies the entire field" with respect to regulation of Public Utilities (*i.e.*, field preemption). As a consequence, municipal ordinances which have the effect of regulating Public Utilities or otherwise frustrate/interfere with the Utility Code are preempted as applied to Public Utilities.

25.     Such "field preemption" is a consequence of the Pennsylvania General Assembly's intent that the Utility Code prescribe a uniform regulatory landscape for Public Utilities by entrusting their regulation and the furnishing of utility service to the exclusive jurisdiction of the PUC. *See Department of Licenses and Inspections, Board of License and Inspection Review v. Weber,* 147 A.2d 326, 327(Pa. 1959)("it is obvious that where a statute specifically declares it has planted the flag of preemption in a field, all ordinances on the subject die away as if they did not exist."); *County of Chester v. Philadelphia Electric Co.*, 218 A.2d 331, 333 (Pa. 1966) (holding that "the Legislature has vested in the [PUC] exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities"); *Duquesne Light Co. v. Upper St. Clair Township*, 105 A.2d 287, 292 (Pa. 1954)("[T]he policy of the Commonwealth in entrusting to the [PUC] the regulation and supervision of public utilities has excluded townships from the same field . . . . Unless the legislature has given an *express* grant of power to townships, the Commonwealth's own expressed policy on the subject is undiminished and supreme.").

26.     Most recently, in the 2019 case of *PPL Electric v. City of Lancaster*, a unanimous Pennsylvania Supreme Court succinctly articulated the foregoing as follows:

> The State . . . has given the PUC all-embrace regulatory jurisdiction over [Public Utilities] . . . [J]urisdiction in matters concerning the relationship between public utilities and the public lies in the PUC, **encompassing rates**, **service, rules**

> **of service, extension and expansion, hazard to public safety due to use of utility facilities, installation of utility facilities, and,** *inter alia,* **location of utility facilities**. To avoid the harm that would follow from the convolution of fragmentary local regulation of public utilities, the General Assembly vested in the PUC exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utility facilities.

214 A.3d 639, 659 (Pa. 2019)(internal citations omitted; emphasis added).

27.     While affirmed repeatedly throughout the years, the right of Public Utilities like National Fuel to provide utility service free from municipal regulation and interference is not new: decades ago, the Pennsylvania Supreme Court in *Duquesne Light Co. v. Upper St. Clair Twp.* held that regulation of public utilities was intended by the General Assembly to be through a single regulatory structure, namely, the PUC, and that allowing a municipal ordinance to regulate public utilities would create an unlawful dual regulatory structure. 105 A.2d 287, 292 (Pa. 1954).

28.     Among other reasons, Pennsylvania courts have rooted the conclusion that the Utility Code stands to occupy the "entire field" of regulating Public Utilities: (a) based on the fact that municipalities generally lack the technical expertise to regulate Public Utilities; and (b) mindful of the potential for municipalities to abuse such regulatory powers in a manner which would harm the public at large. In this regard, the *Upper St. Clair* court noted:

> Local authorities not only are ill-equipped to comprehend the needs of the public beyond their jurisdiction, but, and equally important, those authorities, if they had the power to regulate, necessarily would exercise that power with an eye toward the local situation and not with the best interests of the public at large as the point of reference.

105 A.2d at 293.

29.     In addition to the preemptive effect of the Utility Code on municipal actions which attempt to regulate or otherwise frustrate the purpose/goal of the Utility Code, Public Utilities like National Fuel also possess certain statutory rights, powers, and property interests, pursuant to several additional sources of Pennsylvania law, including the BCL.

30.     In this regard, significant to the instant action is Section 1511(e) of the BCL, which confers upon Public Utilities like National Fuel with the vested property interest and right to:

> enter upon and occupy streets, highways, waters and other public ways and places for [the purposes of furnishing utility services] and ancillary purposes reasonably necessary or appropriate for the accomplishment of the principal purposes, including the placement, maintenance and removal of aerial, surface and subsurface Public Utility facilities thereon or therein…

15 Pa.C.S. § 1511(e).

31.     Public Utilities' rights under Section 1511(e) of the BCL are subject only to municipalities' ability to dictate the "time" and "manner" during which their streets are opened. *Id.; see also Pa. Power Co. v. Twp. of Pine*, 926 A.2d 1241, 1251 (Pa. Commw. 2007).

32.     Thus, National Fuel: (a) is exempt from municipal regulation, because municipal regulation is preempted by the Utility Code, which vests exclusive regulatory power over Public Utilities in the PUC; and (b) has a property right and interest arising under Pennsylvania statutory law to occupy and enter the roadway for the purpose of furnishing utility service.

C. **The City of Erie's Limited Authority to Enact Ordinances/Take Municipal Action.**

1. *The Limited Powers of Pennsylvania Municipalities.*

33.     Pennsylvania municipalities may exercise only those powers specifically delegated to them by the Pennsylvania General Assembly. *Huntley & Huntley, Inc. v. Borough Council of Oakmont*, 964 A.2d 855, 862 (Pa. 2009)("Municipalities . . . have no inherent powers of their own. Rather, they possess only such powers of government as are expressly granted to them and as are necessary to carry the same into effect.")

34.     The Pennsylvania Supreme Court has long held that municipal ordinances must contain objective criteria to be valid. *Appeal of O'Hara*, 131 A.2d 587, 593 (Pa. 1957)(fundamental rule that an ordinance must establish standards to operate uniformly and ordinances are invalid when administration and enforcement are left to discretion, caprice or arbitrary action).

35.     Moreover, with respect to charging fees in connection with their enumerated municipal powers, established Pennsylvania law makes clear that municipalities may only impose fees which are reasonably related to their costs in providing the relevant services. *Talley v. Commonwealth*, 553 A.2d 518, 519 (Pa. Commw. 1989); *Golla v. Hopewell Twp. Bd. of Supervisors*, 452 A.2d 273, 274 (Pa. Commw. 1982).

36.     Importantly, a municipality "cannot use its power to charge fees for issuing licenses or permits for the purpose of raising revenue for general governmental purposes." *Raum v. Board of Sup'rs of Treddyffrin Twp.*, 370 A.2d 777, 797 (Pa. Commw. 1977).

37.     As a final but important note, municipalities must also comport with the individual rights afforded to those under the United States Constitution, including, among others:

a.  The Takings Clause of the Fifth Amendment, which limits the fees municipalities may charge to the "fair approximation of the cost of benefits" which they supply. *In re Exide Techs.*, 611 B.R. 21, 32 (Bankr. D. Del. 2020)("user fees are not takings under the Fifth Amendment unless the fees are so excessive that they do not reflect a 'fair approximation of the cost of benefits supplied' by the government.") quoting *Massachusetts v. United States*, 435 U.S. 444, 463 n.19 (1978); and

b.  The Due Process Clause of the Fourteenth Amendment, which prohibits the City of Erie from, *inter alia*, enacting ordinances, rendering decisions, or taking action which would have the effect of depriving one's "life, liberty, or property without due process of laws." *See* U.S. Const., Am. 14.

2.  *The Extremely Limited Powers of Pennsylvania Municipalities vis-à-vis Public Utilities.*

36.     As noted above, as a consequence of the Utility Code which "occupies the entire field" with respect to regulation of Public Utilities (*i.e.*, field preemption), as applied to Public Utilities, otherwise valid municipal actions which have the effect of regulating Public Utilities or otherwise frustrate/interfere with the Utility Code are preempted.

37.     In this regard, while municipalities *generally* have the ability to regulate roadways, (*see*, 11 Pa.C.S. § 12445 as to Third-Class Cities), this authority is greatly limited when applied to Public Utilities, as it is:

a.  Reserved to the PUC under the Utility Code (as recognized not just under case law, but under the Third-Class City Code itself (11 Pa.C.S. § 12445(b)), and

therefore conflicting ordinances which frustrate the purpose of the PUC are preempted; and

b.  Further subjected to the express statutory limits articulated in Section 1511(e) of the BCL.

38.    Indeed, Section 1511(e) of the BCL has been repeatedly construed by Pennsylvania appellate courts to allow a municipality to regulate only the "time" and "manner" of street excavations performed by a Public Utility corporations:

> [Under Section 1511(e) of the BCL, municipalities may only regulate] the manner in which the street or highway is opened, back-filled, repaved, etc., the length of time that the excavation is open, the length of trench opened at one time, the hours of excavation, etc.

*Pa. Power Co. v. Twp. of Pine*, 926 A.2d 1241, 1251 (Pa. Commw. 2007).  *See also*, *PPL Elec. Utils. Corp*, 214 A.3d 639, n. 30 (Pa. 2019)("[t]he reference [in Section 1511(e) of the BCL] to 'permits' is a codification of the prior law relating to the time and manner of opening a street, etc., and is not intended to imply a power to decide whether or not, and by whom, a type of utility service may be offered by means of the contemplated facilities.").

39.    Additionally, the Pennsylvania Supreme Court has held that neither general municipal law nor Section 1511(e) of the BCL provides municipalities with the power or authority to **dictate the location or placement** of utility facilities, as such power is preempted by the provisions of the Utility Code, which vests such authority solely in the PUC. *See PPL Elec. Utils. Corp*, 214 at 656 (Pa. 2019).

40.    Attempts by municipalities to dictate the type, nature, or placement of utility facilities under other municipal law sources (most notably in this regard from powers arising from the Pennsylvania Municipalities Planning Code) (codified at 53 P.S. § 11202 *et seq*., the

"**MPC**"), have been invalidated by Pennsylvania appellate courts, holding that municipal zoning ordinances which limit, restrict, or have the effect of dictating the placement of a Public Utility's facilities are invalid and preempted by the Utility Code. *See South Coventry Twp. v. Phila. Elec. Co.* 504 A.2d 368, 371 (Pa. Commw. Ct. 1986)("the MPC shall not repeal or modify any of the provisions of the [Utility Code]").

41.     The foregoing makes clear: municipalities may not enact ordinances, pass regulations, or otherwise implement policies which have the effect of dictating the placement, location, or otherwise impose conditions upon the facilities of public utilities, since such power is vested and reserved solely in the PUC. *See Del. Riverkeeper Network v. Sunoco Pipeline L.P.*, 179 A.3d 670, 681-82 (Pa. Commw. Ct. 2018)(finding that the safety of pipeline transportation services are expressly committed to the expertise of the PUC by statute); *UGI Utilities, Inc. v. City of Reading*, 179 A.3d 624, 630 (Pa. Commw. Ct. 2017) (holding, "local ordinances that regulate the location of utility lines are preempted by the Public Utility Code where the PUC has regulated the location of those lines, even if the ordinances do not conflict with specific PUC regulations or orders.").

42.     This principle has been applied specifically to situations where municipalities attempt to regulate public utilities under the guise of "tree" or "vegetation" management or preservation. *See PECO Energy Co. v. Twp. of Upper Dublin*, 922 A.2d 996, 1004-05 (Pa. Commw. Ct. 2007)(a township shade tree ordinance that limited tree pruning was preempted where it conflicted with PUC requirements concerning vegetation management near power lines).

3.      *Preemptive Effect of the Utility Code on Fees Imposed by Municipalities in Connection with Furnishing Utility Service.*

43.      Municipalities do not have general authority to charge fees in connection with a Public Utility's use of Public ROWs, as they are preempted because they frustrate the Utility Code's goal of ensuring reasonable utility rates for consumers across the Commonwealth through the uniform statewide regulation of rates by the PUC. *See PPL Elec. Utils. Corp. v. City of Lancaster*, 214 A.3d 639, 642 (2019).

44.      More specifically, the adverse impact of such fees on utility rates is a consequence of the means by which the Utility Code specifies utility rates are set. In this regard, utility rates are approved by the PUC pursuant to the Utility Code. Public Utilities recover the costs of providing service via base rates established through Section 1308 of the Utility Code (66 Pa.C.S. § 1308), and these base rates are designed to allow public utilities to recover "those expenses that are reasonably necessary to provide service to its customers," as well as a reasonable rate of return on its investment. *City of Lancaster v. Pa. Public Utility Commission*, 793 A.2d 978, 982 (Pa. 2002).

45.      Municipal imposition of large general fees upon Public Utilities in connection with the furnishing of utility service (*e.g.*, charging costs in connection with a Public Utility's use of the Public ROW), therefore, is ultimately recovered from the Public Utility's ratepayers, thereby increasing base rates.

46.      The effect: the cost of such fees is ultimately borne by the Public Utility's entire customer base, not just those who reside in the municipality that imposed such fees. *See PPL Elec.*, 214 A.3d at 659 ("subscribers in more frugal or less complex jurisdictions will bear not

only the expense associated with their own service area, but also will subsidize the expenses of other municipalities in which the maintenance costs are greater.")

47.    As the Pennsylvania Supreme Court recently observed, large municipal fees imposed on Public Utilities are effectively general subsidies for the enacting municipality (insofar as a Public Utility's customers located outside of the enacting municipality would be required to pay for it in the form of higher base rates), and could quickly cascade through a domino-like phenomenon where other municipalities similarly would seek to implement such fees, ultimately leading to higher utility rates, prompted by actions of local governments. *Id.*

48.    As a result, the Pennsylvania Supreme Court has opined that the effect of such municipal fees frustrates the Utility Code's purpose of ensuring fair and reasonable rates (and therefore are preempted by the Utility Code):

> Assuming the PUC approves a utility's proposed rate that reflects local . . . fees, thereby passing the expense on to that utility's entire subscriber base, the effect will be that **subscribers in more frugal or less complex jurisdictions** will bear not only the expense associated with their own service area, but also **will subsidize the expenses of other municipalities in which the maintenance costs are greater. This flies in the face of the preference for the fairness and relative simplicity of providing a uniform regulatory framework that ensures a level playing field for all utilities and utility subscribers.**[2]

*PPL Elec. Utils. Corp*, 214 A.3d at 659 (emphasis added).[3]

---

[2] Of note, in *PPL Elec. Utils. Corp.*, the Pennsylvania Supreme Court provided this commentary in the context of ruling that the City of Lancaster's "maintenance fee" (*i.e.*, fee a utility paid to "occupy" the Public ROW) was unlawful. The same analysis applies to this case.

[3] Removing any doubt that a municipality cannot impose fees on Public Utilities in connection with the furnishing of utility service, Section 1511(e) of the BCL does not expressly authorize any fees to be paid to municipalities, but only authorizes municipalities to require permits in connection with a Public Utility's use of the Public ROWs, a fact which the Pennsylvania Supreme Court has pointed out in dicta: "[n]otably, Section 1511(e) does not expressly authorize any fees at all…." *Id.* at 658, n. 34.

49.     Restated, municipalities are preempted from imposing fees on Public Utilities, because such fees undermine the General Assembly's intent to create a uniform regulatory framework for all utilities and their customers. *Id*.

**D.      The City of Erie's Street Excavation Ordinance.**

1.      *The Design of the Street Excavation Ordinance.*

50.     In 1994, the City of Erie enacted a Street Excavation Ordinance (Article 901 of the City of Erie Code of Ordinances, "**Street Excavation Ordinance**") to govern construction in Public ROWs.

51.     The Street Excavation Ordinance imposes a permit scheme, which provides as follows:

> No person, firm, or corporation shall enter upon or occupy any public right-of-way within the City for the purpose of making an excavation or opening in or under any [Public ROW] without having first obtained a permit from the City to do so.
>
> * * *
>
> A City department or bureau making or causing an excavation or opening to be made in any public right-of-way will be required to obtain a feeless permit prior to such work.

Street Excavation Ordinance, § 901.02(a).

52.     To obtain a permit under the Street Excavation Ordinance (the "**Permit**"), an entity must, *inter alia*, (a) submit an application; (b) post a bond; and (c) pay all fees required by the City of Erie. Street Excavation Ordinance, Street Excavation Ordinance, §§ 901.04-901.06.

53.     The City requires that three (3) types of fees be paid in connection with every Permit, as follows: (i) a permit fee, (ii) an inspection fee, and (iii) a degradation fees (collectively, the "**Fee Structure**"). Street Excavation Ordinance, § 901.06.

54.     The Fee Structure and a calculation of each of the fees is as follows:

a. "**Permit Fee:**" a flat fee, currently $100.00 per Permit, which, as specified in the Street Excavation Ordinance, "covers the cost of issuing, processing and filing the street excavation permit."

b. "**Degradation Fee:**" a fee which, as specified in the Street Excavation Ordinance, purportedly "defray[s] a percentage of the costs for resurfacing and reconstruction of City streets resulting from the depreciation of streets associated with street opening." Degradation Fees are currently set on an escalating scale, set by multiplying the square yardage of cuts made by $28.00/square yard (for work in the Utility Strip) or by $50.00/square yard (for work in the Cartway).

c. "**Inspection Fee**:" a fee which, as specified in the Street Excavation Ordinance, purportedly is applied to "defray street opening inspection costs." Inspection Fees are set on an escalating scale based on the number of square yards, starting at $60.00.

Street Excavation Ordinance, § 901.06(c).

2.   *Unlawful Nature of the Street Excavation Ordinance's Fee Structure*.

55.   The Street Excavation Ordinance's Fee Structure is unlawful for several reasons.

56.   First, as applied to National Fuel and other Public Utilities, the Fee Structure is unlawful because it is preempted by the Utility Code.

57.   Second, the Fee Structure is legally defective on its face, in that the fees are set at an arbitrary, excessive and unreasonable amount, which bears no relation to either the stated purpose for each fee component, or for the City's actual costs.

58.     That the Fee Structure is arbitrary, excessive and unreasonable is demonstrated by comparing it to the fees charged by the Pennsylvania Department of Transportation ("**PennDOT**") for the same type of utility excavation work performed on state-owned roadways.

59.     Under regulations governing Public ROWs for roads maintained by PennDOT, entities excavating state-owned streets only pay: (a) a $50.00 application fee (*i.e.*, half of the City of Erie's Application Fee); and (b) an inspection fee of $40 for opening one hundred (100) <u>linear</u> feet of street. *See*, 67 Pa. Code § 459.4.

60.     The table below illustrates the large deviation between fees charged by the City of Erie pursuant to the Fee Structure of the Street Excavation and those which would be charged under PennDOT's fee structure by comparing amounts National Fuel paid to the City of Erie for recent utility work (each, a "**Project**") to the hypothetical costs each Project would have incurred if it had been performed on a state-owned roadway:

| Project Location Within the City of Erie | Total Footage Permitted | Actual Project Fee Paid to City of Erie | Projected Fee Calculated Using PennDOT's Fee Structure |
|---|---|---|---|
| 29th Street | 2939 | **$1,710** | **$380** |
| East Ave. / McBride | 591 | **$8,428** | **$100** |
| State St. & 41st | 1516 | **$7,513** | **$150** |
| 30th & Elmwood | 2511 | **$1,490** | **$260** |
| Nancy Ave. & 38th | 524 | **$1,930** | **$100** |
| 42nd & Washington | 727 | **$3,513** | **$80** |
| 31st & Cherry | 616 | **$1,388** | **$70** |
| 31st & Raspberry | 131 | **$1,130** | **$20** |
| Peach St. & W 4th | 197 | **$3,067** | **$70** |
| E.24th & Parade | 224 | **$4,238** | **$70** |

61.     The above table shows that in some cases, the City of Erie's total fees for a single

Project are over eight-four (84) times larger than the corresponding fee which PennDOT would have charged for the same.

62.     It is impossible to justify the thousands of dollars in "degradation" fees which the City of Erie charges on a single project, when the same project on a state route is not subject to a single dollar in "degradation" fees.

63.     When comparing the City's Fee Structure with PennDOT's, the largest difference between the two is the fact that PennDOT does not charge any "degradation" fees. This leads to the logical conclusion that there is no "degradation" sustained by roadways when utilities like National Fuel conduct their work.

64.     Another large difference between the City's Fee Structure and PennDOT's pertains to the nature in which inspection-type fees are calculated: the City of Erie's Inspection Fees are based on the square yardage of the area impacted by excavation, with a base inspection fee of $115.00 for 101 square yards, plus two dollars for each additional square yard, while PennDOT charges only an inspection fee of $40.00 to inspect opening one hundred (100) linear feet of street. *See* 67 Pa. Code 459.4(b)(1)(i)(A).

65.     Beyond being set an unreasonable amount, the Street Excavation Ordinance's Fee Structure is unlawful because the Fees, insofar as they are not reasonably related to the cost incurred by the City, is therefore being used for purposes other than those asserted by the City as a revenue-generating tax, and therefore, it wrongfully generates revenue for the City of Erie to use in any manner it deems fit.[4]

---

[4] *See*, Final Budget for Year 2021 approved pursuant to Erie City Council Ordinance No. 45-2020 on December 17, 2020 ("**Budget**"), line 3217 (as to treatment of Fees received per the Street Excavation Ordinance). The Budget also confirms that the "General Fund" is "used to account for the ordinary operations of a government unit that are financed from taxes and other general revenues and appropriates expenditures which are not accounted for in another fund" on p. 14.".

66.     Confirming the foregoing: per the City's 2021 Budget, Fees derived from the Street Excavation Ordinance are deposited into the City's "General Fund" – an unrestricted account from which almost any municipal activity can be funded.[5]

67.     Additionally, the Degradation Fee is, in a special way, egregious, excessive, and unlawful in that: (a) per the terms of the Street Excavation Ordinance, entities excavating City streets (like National Fuel) are already responsible for the repair of City streets following excavation activity;[6] and (b) National Fuel's repair of City streets after completing its underground construction work, does not degrade the street's structure.[7]

68.     Thus, National Fuel is unlawfully being forced to pay large Degradation Fees to the City of Erie for the right to access and install its Facilities, despite the fact that the City has no costs relegated to the "degradation" of its streets, and no degradation is caused by National Fuel's work.

69.     Moreover, the unlawful nature of the Degradation Fee is confirmed by the fact that Degradation Fees are assessed for excavation work done in the grassy Utility Strip and sidewalks, despite the fact that the City – per the express language used in the Street Excavation Ordinance – has stated the purpose of the Degradation Fee is purportedly to help "defray a percentage of **the costs for resurfacing and reconstruction of City streets resulting from the depreciation of streets** associated with street openings." Street Excavation Ordinance, § 901.01(f)(emphasis added).

---

[5] *See, supra*..
[6] Street Excavation Ordinance, § 901.10(a) "The permittee shall be responsible for backfilling and paving the opening and restoring the street surface to its original condition prior to the street cut."
[7] The City of Erie's then-Director of Public Works, David Mulvihill, admitted that National Fuel's construction work does not degrade the streets, during a meeting with National Fuel representatives on July 29, 2020.

70.     Thus, by charging Degradation Fees for work outside the Cartway, the City proves that the Degradation Fee neither: (a) is related to costs incurred by the City in administering the Street Excavation Ordinance – a clear violation of Pennsylvania law; (*see Talley v. Commonwealth*, 553 A.2d 518, 519 (Pa. Commw. 1989)("a municipality may only impose fees which are reasonably related to the municipality's costs in providing the relevant services"); *Raum v. Board of Sup'rs of Treddyffrin Twp.*, 370 A.2d 777, 797 (Pa. Commw. 1977)("a municipality "cannot use its power to charge fees for issuing licenses or permits for the purpose of raising revenue for general governmental purposes.")); nor (b) is collected in furtherance of the claimed City objective.

71.     In a similar way, the City of Erie's Inspection Fee is unlawful insofar as it is both: (a) excessive, arbitrary, and unrelated to costs actually borne by the City; and (b) in many cases, the City does not even perform the post-work inspection of either the Cartway or the Facilities.

3.     *Harm Caused City of Erie's Fee Structure*.

72.     Since 2014, National Fuel has paid the City of Erie approximately $1,300,000 pursuant to the unlawful Fee Structure for work on its facilities located within City of Erie Public ROWs, as shown below:

| Fees Paid to the City of Erie from FY 2014 through FY 2020* in Connection with the Street Excavation Ordinance[8] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (*National Fuel's Fiscal Year Begins Oct. 1*) | | | | | | | | |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| Degradation/Inspection | 61,086 | 379,613 | 179,297 | 147,248 | 101,097 | 130,736 | 135,814 | 1,134,891 |
| Permits | 21,703 | 22,199 | 21,420 | 17,730 | 20,250 | 22,710 | 24,700 | 150,712 |
| **Total** | **82,789** | **401,812** | **200,717** | **164,978** | **121,347** | **153,446** | **160,514** | **1,285,603** |

---

[8] National Fuel is subject to additional permitting, inspection and degradation fees which have accrued in 2021, which National Fuel has withheld on the grounds that the fees are illegal.

73.     National Fuel is particularly concerned about the Street Excavation Ordinance's fees because the Utility Code specifies they are a cost which is recoverable by ratepayers, thereby increasing base rates.

74.     Notably, as a function of how rates are set by the PUC (pursuant to the Utility Code), such fees stand to unfairly increase the cost of providing natural gas to both ratepayers located within the City of Erie and in the other municipalities in National Fuel's Pennsylvania Service Territory. *See PPL Elec. Utils. Corp.* 214 A.3d at 659 ("subscribers in more frugal or less complex jurisdictions will bear not only the expense associated with their own service area, but also will subsidize the expenses of other municipalities in which the maintenance costs are greater.")

75.     Simply put, the Fee Structure raises revenue which the City of Erie can use on *any* expense paid for from the City's General Fund, and it is not fair to force National Fuel's ratepayers outside of the City of Erie to contribute to the City's General Fund.

76.     National Fuel has repeatedly raised the issue of these excessive Fee Structure with the City of Erie, without success.

**E.      The City of Erie's Tree Protection Plan ("TPP")**

1.     *Overview*.

77.     On December 28, 2005, the City of Erie adopted the Urban Forest Ordinance (the "**Urban Forest Ordinance**") which established an Urban Forest Committee (the "**Committee**"). Urban Forest Ordinance, § 165.05.

78.     The Committee was directed to create Rules and Regulations by §165.05(m) of the Urban Forest Ordinance.

79.     The Committee then adopted "Rules and Regulations" in 2011 pursuant to § 165.05 of the Urban Forest Ordinance, without any notice or opportunity to be heard, or anything that remotely resembles due process, as required to establish new municipal ordinances with force of law (the "**2011 Rules**").

80.     A document attached to the 2011 Rules was entitled "Tree Protection Best Practices and Protocol" (the "**TPP**"). Among other things, the TPP specifies:

  a.   No work can be conducted within twenty-five (25) feet of "street tree" planted in a public right-of-way without prior approval form the City;

  b.   No "boring, tunneling or jacking" may be initiated less than twenty (20) feet from a tree twenty (20) inch in diameter;

  c.   No "trenching" is allowed within twenty (20) feet from a tree twenty (20) inch in diameter;

  d.   All excavation for "utility" construction is prohibited within the tree's "critical root zone," as defined by the City;

  e.   Roots over one inch in diameter shall not be cut without written permission of the City arborist;

  f.   A permit is required prior to commencing any excavation work, to confirm that the planned location of the construction will not impact any of the surrounding trees; and

  g.   All excavation permit applications must contain a ten-point "tree protection plan,"

based on the specific layout of trees within the proposed construction zone.

81.     Although presented as a "best practices" document (rather than as law), the City of Erie now holds the TPP out as binding municipal law, despite the fact that it was never voted on or otherwise adopted by the City Council pursuant to procedures described by Pennsylvania municipal law, including those prescribed in the Third-Class City Code.

82.     In this regard, for the first time in 2020 – *some nine (9) years after its publication – and with no authority to do so under the Street Excavation Ordinance or other sources of* municipal law, the City of Erie began requiring National Fuel to comply with the TPP by imposing strict compliance with same as a condition/requirement of receiving a Permit for excavation work done in the Public ROWs.

83.     Neither the TPP nor the Street Excavation Ordinance specify any sort of procedure for petitioning for exemption from strict compliance.

84.     Similarly, neither the TPP nor the Street Excavation Ordinance authorize any City official or office to exempt any person or entity from compliance with the TPP in this regard.

85.     Put another way, there is no notice, opportunity to be heard, or other forum by which National Fuel can challenge any grievances it may have with the TPP and its application to Permits issued under the Street Excavation.

2.     *Unlawful Nature of the TPP*.

86.     The TPP is unlawful for several reasons.

87.     First, it is facially defective in that it is: (a)  being held out as binding law, without its due adoption per the procedures specified in the Third-Class City Code and in a manner that comports with even the most basic level of Constitutionally-required due process; and (b) being

applied in a manner not lawfully authorized by the Street Excavation Ordinance or other valid municipal enactment (insofar as it is superimposed as a condition for the issuance of a Permit under the Street Excavation Ordinance).

88.    Second, as applied to Public Utilities like National Fuel, the TPP is unlawful as applied insofar as it has the effect of dictating the placement or location of utility facilities – in violation of the Utility Code, which preempts any form of municipal regulation which impacts the placement of utility facilities.

89.    Additionally, as enforced by the City of Erie, the TPP directly conflicts with certain PUC Regulations, such as the explicit requirement in Section 59.18 of the PUC Regulations which provides that "service line must be installed in a straight line perpendicular to the [gas] main." 52 Pa. Code § 59.18(f)(3).

90.    Pursuant to and in furtherance of the TPP, the City has repeatedly tried to conscript National Fuel to ignore Section 59.18 of the PUC Regulations when installing new or replacement service lines to customers by asking National Fuel to run service lines at an "off-angle" from the gas main to the building being served (in an effort to avoid National Fuel running a perpendicular service line (as the PUC Regulations require) which may be located in the area the City has deemed "critical" for the protection of trees comply with the City's TPP). National Fuel, citing its obligations to comply with the PUC Regulations, has refused to run "off-angle" service lines.

91.    Third, the TPP's stated goal to "promote the Urban Forest" and the means by which it purports to do so are arbitrary and unreasonable, adopted without consideration of the trees, environment, or ecosystem of the City of Erie.

3. *Harm Caused to National Fuel by the TPP*.

92.     The TPP gives the City control over where National Fuel places its Facilities because it significantly restricts any excavation work in a broad area around trees planted in the Public ROWs.

93.     In effect, compliance with the TPP has the effect of making work in Public ROWs practically impossible in certain neighborhoods.

94.     By demanding that National Fuel comply with the TPP, the City has forced National Fuel to place its Facilities in locations or in configurations other than the optimal conditions it would have chosen relying solely on its technical expertise.

95.     Consequently, the TPP causes actual harm to National by forcing it to expend time and resources to modify plans for utility upgrades and repair to relocate them away from the Utility Strip.

96.     In this regard, the TPP has forced National Fuel to expend time and resources to obtain easements from private landowners for such work rather than performing such work in the area National Fuel deems optimal from a safety, efficiency, and reliability perspective and in violation of its right to occupy the Public ROWs.[9]    Private ROW for projects which National Fuel lawfully should have been able to perform in the Utility Strip; and (3) National Fuel had to relocate work to the Cartway, therefore causing it to incur higher "degradation" fees under the Street Excavation Ordinance.

---

[9] Illustrating how the TPP impacts National Fuel's operations, in June, 2021, National Fuel was required to obtain easements for work in Private ROWs to construct replacement Facilities in the Frontier-neighborhood of the City of Erie instead of using Public ROWs, because the City refused to issue National Fuel a Permit due to concerns with the Project's compliance with the TPP. In other scenarios, National Fuel has proactively modified its utility upgrade/repair projects to avoid undue delays in completing such work.

97.     This, in turn, directly: (a) impacts National Fuel's operations, (b) frustrates National Fuel's ability to optimally provide safe, efficient, and reliable natural gas service pursuant to the Utility Code; and (c) stands to unfairly increase the cost of providing natural gas to ratepayers located both within and outside of the City of Erie. *See PPL Elec.*, 214 A.3d at 659 ("subscribers in more frugal or less complex jurisdictions will bear not only the expense associated with their own service area, but also will subsidize the expenses of other municipalities in which the maintenance costs are greater.")

**F.     A Chronology of the City of Erie's Efforts to Control the Location of National Fuel's Facilities and its Efforts to Strategically Receive the Highest Per-Project Revenues for the City's General Fund.**

98.     The following timeline of events demonstrates how the City of Erie has used the Street Excavation Ordinance permitting process, together with the TPP, to maximize "degradation" fees:

a.     On or about January 15, 2020, National Fuel representatives met with City of Erie representatives to discuss ongoing issues over the placement of National Fuel's Facilities (including issues arising under the TPP).

b.     During that meeting, the City of Erie indicated that it was concerned that the placement of National Fuel's Facilities could impact trees, and advised that the City of Erie felt it had the authority to require prior approval of National Fuel's Facility placement within the City limits.

c.     On or about February 24, 2020, National Fuel met with then-City of Erie Director of Public Works David Mulvihill and offered to confer with the City regarding the placement of National Fuel's Facilities, but reiterated that the City of Erie could

not take actions which had the effect of dictating where National Fuel places its facilities as a result of the preemptive effect of the Utility Code on same.

d. In response, the City rejected National Fuel's explanation of existing Pennsylvania law by contending that because National Fuel was required to obtain Permits in connection with excavation work in Public ROWs, the City, in fact, had final authority to determine where National Fuel's Facilities were placed.

e. On April 29, 2020, then-Director Mulvihill emailed National Fuel representatives, advising that the City would "like to revisit" the issue of how "working off-street can potentially have a negative effects [sic] on street trees."

f. In this regard, then-Director Mulvihill sent links to the 2011 Rules (per the Urban Forest Ordinance) and TPP, advising – for the first time – that the 2011 Rules "have not been followed" by National Fuel and were conditions for the issuance of Permits.

g. After reviewing the matter, National Fuel politely responded by pointing out that,

> the majority of the ordinances or best practices are [not] applicable as they relate to National Fuel. The provided requirements infringe upon the Pennsylvania Public Utility Commission's exclusive authority over the complex and technical service and engineering questions arising in the location, construction and maintenance of all public utilities facilities. As previously discussed, National Fuel, as a Public Utility, is authorized to conduct its work in public right of way without unreasonable interference from the City.

h. National Fuel then explained that despite its exemption from the City's ordinances, it had "procedures in place to ensure that all trees and vegetation are

protected," and that National Fuel would follow the City's "guidelines where applicable."

i.   Calling National Fuel's position "unfortunate," on May 11, 2020,   Director Mulvihill announced that starting immediately, the City was changing its position and would require National Fuel to obtain prior Permits (per the Street Excavation Ordinance) for all excavation work within the City:

> For many years the City has allowed National Fuel to work within the rights-of-way without first obtaining a permit. The permit would be obtained after the fact - an "honor system," so to speak. The fact that National Fuel does not believe that the majority of the ordinances or best practices are applicable to National Fuel, leaves the City with no choice but to discontinue the long standing practice of allowing National Fuel to operator excavate [*sic*] within the rights-of-ways without a permit… No work will be allowed to be performed within the rights-of-way without a permit.

j.   Attempting to cooperate with the City as much as possible, National Fuel immediately began requesting permits for the excavation work which it needed to complete within the City limits.

k.   However, instead of resolving the matter, the City of Erie began demanding that National Fuel redesign its engineering and construction plans to relocate work away from trees, and into the Cartway, and then resubmit revised permit applications for review.

l.   The City of Erie's refusal to grant the excavation permits quickly forced National Fuel's counsel to petition the City Solicitor's office to intervene, and request that the permits be issued in compliance with settled Pennsylvania law.

m. Finally, on July 14, 2020, Assistant City Solicitor Catherine Doyle agreed to approve a single project Permit, on the condition that National Fuel meet with the City to discuss "National Fuel's comprehensive plan of its next projects within the City of Erie." In closing, Assistant Solicitor Doyle reiterated that "the City is not waiving any objection to future inadequate permits."

n. On July 29, 2020, National Fuel representatives did meet with the City of Erie, which once again demanded that National Fuel cede authority to control the location and placement of all National Fuel Facilities within the City of Erie.

o. A few days later, on August 3, 2020, Director Mulvihill visited the site of a National Fuel construction project and not only demanded that the City have final control over National Fuel project locations, but also that the City would be requiring even more detailed permit applications from National Fuel.

98. Among other things, the foregoing illustrates that the City of Erie placed significant, undue, and increasingly escalating pressure on National Fuel, by withholding/threatening to withhold Permits for National Fuel's utility upgrades and repair work located in Public ROWs.

99. As noted above, this undue pressure from the City has come notwithstanding the fact that the City of Erie has absolutely no legal authority to oversee or regulate the manner in which National Fuel designs, places, or installs its Facilities in Public ROWs.

100. National Fuel's efforts to amicably resolve these matters, through dialogue, discussion, and concrete actions (including National Fuel preparing and proposing to voluntarily

comply with its own Tree Protection Plan – which was prepared in collaboration with a certified arborist and tailored to the trees located in the City of Erie) have been totally rejected.

101.    The foregoing begs the question "why?" Upon information and belief, the imposition of the TPP as a condition for the issuance of a Permit under the Street Excavation Ordinance (in 2020 – some nine years after the TPP was first published as part of the 2011 Rules) and the City's refusal to amicably resolve the legal challenges to same posed by the City of Erie was done with the intent to force excavation work from entities like National Fuel to the Cartway, where the City of Erie can then assess the maximum Degradation Fees of $50/square yard (versus $28/square yard in the Utility Strip).

102.    Particularly illustrative of the foregoing is the fact that while National Fuel has attempted to redesign its plans for scheduled utility upgrades and repair work by performing such work in Private ROWs (which are beyond the scope of the TPP), the City nevertheless has expressed a strong preference that such work be done in the Cartway.

## COUNT I - INJUNCTIVE RELIEF

103.    The averments in the foregoing paragraphs are incorporated by reference, as if set forth in full below.

104.    In evaluating a motion for preliminary injunctive relief, a court must consider whether: "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *NutraSweet Co. v. Vit-Mar Enterprises, Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (quoting *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998)).

105.    The City of Erie's: (a) Fee Structure imposed under the Street Excavation Ordinance; and (b) efforts to regulate the placement of National Fuel's Facilities, including without limitation through the TPP and its imposition as a condition for the issuance of Permits under the Street Excavation Ordinance are illegal as applied to National Fuel.

106.    The City of Erie's: (a) Fee Structure imposed under the Street Excavation Ordinance; and (b) efforts to regulate the placement of National Fuel's Facilities are illegal because National Fuel is a Public Utility and the City is preempted by the Utility Code from any action which has the effect of regulating Public Utilities or frustrating the purposes of the Utility Code.

107.    In addition, the Street Excavation Ordinance's Fee Structure is unlawful on its face because the Fees imposed are arbitrary, excessive, unreasonable, and wholly unrelated to any actual cost borne by the City of Erie in relation to its administration of the Street Excavation Ordinance.

108.    Thus, the first element of the test for injunctive relief is satisfied, because National Fuel's right to relief against the City of Erie is clear.

109.    The Pennsylvania Supreme Court has repeatedly found that the second element of "immediate and irreparable harm" is met when a plaintiff demonstrates that complained-of conduct is in violation of a Pennsylvania statute. *See SEIU Healthcare Pa. v. Commonwealth*, 104 A.3d 495, 508 (Pa. 2014)("where the offending conduct sought to be restrained through a preliminary injunction violates a statutory mandate, irreparable injury will have been established."); *Commonwealth v. Coward*, 414 A.2d 91, 98-99 (Pa. 1980) (holding that where a statute prescribes certain activity, the court need only make a finding that the illegal activity

occurred to conclude that there was irreparable injury for purposes of issuing a preliminary injunction).

110.   This general principle of law has been specifically used to enjoin alleged violations of Pennsylvania's public utility laws. *See Pa. Pub. Util. Com. v. Israel*, 52 A.2d 317, 322 (Pa. 1947)("When the provisions of the Public Utility Commission Law are being violated… it is our duty to issue a preliminary injunction.")

111.   The Pennsylvania Supreme Court has enjoined the illegal regulation of Public Utilities - even when the sole claim of harm was the unlawful distribution of funds. *See Pa. Pub. Util. Com v. Process Gas Consumers Grp.*, 467 A.2d 805, 809 (Pa. 1983) ("Although the realities of the controversy here go to the disposition of money, we believe that there is a sufficient showing of irreparable harm" because there was no simple means of correcting illegal costs which are ultimately borne by ratepayers).

112.   The Pennsylvania Supreme Court has also concluded that preventing Public Utilities from completing the work which they identify as necessary is irreparably harmful because it could "curtail services to its customers." *Duquesne Light Co. v. Upper St. Clair Tp.*, 105 A.2d 287, 295 (1954)(enjoining enforcement of a zoning ordinance against a public utility, which was being applied to curtail new construction of power lines needed to bring electricity to ratepayers).

113.   At the most fundamental level, this second element of irreparable harm is satisfied because National Fuel's rights under various sources of Pennsylvania law, including the Utility Code and the BCL, continue to be violated by both the Street Excavation Ordinance's Fee Structure and the TPP.

114.     Among other ways, the Fee Structure and the TPP violate National Fuel's statutory and other legal rights as follows:

    a.  With respect to the Street Excavation Ordinance's Fee Structure, it is both: (a) illegal as applied (*i.e.*, preempted by the Utility Code since National Fuel is a Public Utility and the Fees imposed by the Fee Structure stand to increase the rates under which National Fuel provides service to its customers); and (b) unlawful on its face (as the Fees are arbitrary, excessive, and unreasonable and therefore violate established principles of Pennsylvania municipal law and provisions of the United States Constitution, as noted below); and

    b.  With respect to the City's TPP (including as applied as a requirement to obtain a Permit under the Street Excavation Ordinance), it is preempted, and therefore unlawful, as applied to National Fuel insofar as it has the effect of dictating the location and placement of National Fuel's Facilities in contravention of the Utility Code.

115.     The irreparable harm in the instant case – *i.e.*, violation of National Fuel's statutory rights – is not merely academic.

116.     The City of Erie has engaged in unlawful, sustained, and continuous interference, obstruction, and frustration of National Fuel's statutory mandate to provide safe, efficient, and reliable service at fair and reasonable rates pursuant to the provisions of the Utility Code, including by interfering, obstructing, impacting, and/or frustrating, among other things, the following:

a.  National Fuel's obligation to provide gas service to new residential customers within set time frames. *See*, 52 Pa. Code § 56.287.

b.  National Fuel's obligation to extend its facilities so as to serve new customers and development. *See*, Tariff, Rule No. 3.

c.  National Fuel's obligations under various provisions of Chapter 59 of the PUC Regulations, including without limitation the explicit requirement that when installing a service line, "the service line must be installed in a straight line perpendicular to the [gas] main." 52 Pa. Code § 59.18(f)(3). The City has repeatedly asked National Fuel to run service lines at an "off-angle" so as to comply with the City's TPP. National Fuel, citing its regulatory obligations, has refused to do so.

d.  The cost paid by <u>both</u> National Fuel and applicants for new service in instances where the furnishing of new service requires the extension of National Fuel's Facilities (*e.g.*, construction of a new home). *See*, Tariff, Rule No. 3.[10]

e.  National Fuel's obligation to provide service which is reasonably continuous and without unreasonable interruptions or delays. *See*, Tariff, Rule No. 9 and Section 1501 of the Utility Code (66 Pa.C.S. § 1501).

f.  National Fuel's obligation to "make all such repairs, changes, alterations, substitutions, extensions, and improvements in or to such service and [F]acilities as shall be necessary or proper for the accommodation, convenience, and safety of its patrons, employees, and the public. Such service also shall be reasonably

---

[10] Customers requiring extension of National Fuel's Facilities in connection with receiving service are directly impacted insofar as the PUC-approved Tariff apportions responsibility for the initial cost of extending such Facilities between National Fuel and the customer requesting same.

continuous and without unreasonable interruptions or delay." *See*, Section 1501 of the Utility Code (66 Pa.C.S. § 1501).

g.   National Fuel's obligation to provide service at rates which are "just and reasonable." *See*, Section 1301 of the Utility Code (66 Pa.C.S. § 1301).[11]

117.   The third element, lack of irreparable harm to the City of Erie, is also satisfied.

118.   The City has had trees lining its streets for centuries, and yet has not demanded full authority to confirm the location of National Fuel's Facilities until little over a year ago (by virtue of the TPP and it being imposed as a Permit requirement per the Street Excavation Ordinance).

119.   National Fuel has a proven track record of performing its maintenance and construction work while respecting and preserving the trees which line Erie's streets, and an injunction will not cause any undue harm to this important vegetation.

120.   Enjoining the City from raising funds through imposition of excessive fees (per the Fee Structure of the Street Excavation Ordinance) will not irreparably harm the City, which enjoys the legal authority to raise funds through legal means, including borrowing, issuing municipal bonds, and collecting taxes.

121.   Finally, the fourth element, the public interest, is met because the general public needs and relies on the utility services provided by National Fuel, and any disruption caused by the City of Erie's interference with National Fuel's maintenance and construction work will have a real impact on National Fuel's ratepayers.

---

[11] Notably, the PUC – on its own motion or upon complaint – may <u>at any time</u> investigate and modify any Public Utility's rates, meaning the unlawful Fees and costs of complying with the unlawful actions of the City of Erie (described herein) could be factored into National Fuel's rates at any time. *See*, 66 Pa.C.S. §§ 1308-1309.

122.    Further, it is always in the public interest for the government to be constrained to those limits which the law creates, and to rein in excesses caused by municipalities when they regulate conduct beyond their scope of legitimate authority.

WHEREFORE, Plaintiff National Fuel Gas Distribution Corporation respectfully requests that this Honorable Court enjoin the City of Erie from: (1) imposing unreasonable and excessive fees against National Fuel, including without limitation by suspending and invalidating the Street Excavation Ordinance's Fee Structure; and (2) attempting to regulate the placement of National Fuel's Facilities, by requiring compliance with the TPP in connection with the issuance of a Permit under the Street Excavation Ordinance or other municipal action, and any other relief available by law.

## COUNT II - DECLARATORY JUDGMENT

123.    The averments in the foregoing paragraphs are incorporated by reference, as if set forth in full below.

124.    The Declaratory Judgment Act provides in relevant part that "[i]n a case of actual controversy within its jurisdiction . . . any Court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Fed. R. Civ. P. 57.

125.    "The question in each case is whether the facts alleged show that there is a substantial controversy, between parties having adverse legal interests, 'of sufficient immediacy

and reality to justify judicial resolution.'" *Peachlum v. York, Pa.*, 333 F.3d 429, 433 (3d Cir. 2003).

126.    The Third Circuit has set out the following general guidelines for the exercise of discretion under the Declaratory Judgment Act: "(1) the likelihood that the declaration will resolve the uncertainty of obligation which gave rise to the controversy; (2) the convenience of the parties; (3) the public interest in a settlement of the uncertainty of obligation; and (4) the availability and relative convenience of other remedies." *Terra Nova Ins. Co. v. 900 Bar. Inc.*, 887 F.2d 1213, 1224 (3d Cir. 1989).

127.    In *Gruntal & Co., Inc. v. Steinberg*, the district court explained:

> The real value of the judicial pronouncement — what makes it a proper judicial resolution of a "case or controversy" rather than an advisory opinion — is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff . . . . If the declaratory judgment is sought to protect against a feared, future event, the plaintiff must demonstrate that the probability of that future event occurring is real and substantial, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

837 F. Supp. 85, 89 (D.N.J. 1993).

128.    In this case, there are two (2) ongoing issues for which judicial review and declaratory judgment is appropriate and necessary:

  a.    With respect to the Street Excavation Ordinance's Fee Structure, to declare that it is both: (a) illegal as applied to National Fuel (*i.e.*, preempted by the Utility Code since National Fuel is a Public Utility); and (b) unlawful on its face (as the Fees are arbitrary, excessive, and unreasonable and therefore violate established Pennsylvania municipal law); and

b.  With respect to the City's TPP (including as applied as a requirement to obtain a Permit under the Street Excavation Ordinance), to declare that it is preempted, and therefore unlawful, as applied to National Fuel insofar as it has the effect of dictating the location and placement of National Fuel's Facilities.

129.    Here, each element of the test for imposing a declaratory judgment is met.

130.    The first element, that a judgment would remove the uncertainty between the parties, is met because such a judgment would confirm that: (a) the Street Excavation Ordinance's Fee Structure is unlawful (both on its face and as applied to National Fuel unreasonable; and (b) the City has no authority to regulate the placement of National Fuel's Facilities – whether via the TPP or otherwise.

131.    The second element, the convenience of the parties, is met because these issues have been unresolved despite almost two (2) years of repeated discussions between the parties, with National Fuel being forced to alter its utility work plans and designs by virtue of having to perform both scheduled and emergency utility work within the City of Erie in connection with its operations.

132.    The third element, public interest in resolution, is clearly met because, among other reasons, (a) those receiving natural gas service in National Fuel's Pennsylvania Service Territory stands to bear  the costs incurred as a result of the City's unlawful conduct insofar as such costs can be included in the rates set and approved by the PUC; and (b) it is always in the public interest for the limits of municipal authority to be clearly defined, and for the public to be assured of reliable utility services.

133.    Finally, the fourth element is met because there is no clear means for ensuring that this problem does not continue to arise between National Fuel and the City of Erie, other than judicial intervention.

WHEREFORE, Plaintiff National Fuel Gas Distribution Corporation respectfully requests that this Honorable Court enter declaratory judgment, declaring that: (1) with respect to the Street Excavation Ordinance's Fee Structure, (a) as applied to National Fuel, is preempted by the Utility Code; and (b) on its face is invalid as the Fees imposed are arbitrary, excessive, and unreasonable; and (2) with respect to the general practices, procedures, and policies of the City to attempt to dictate the placement of National Fuel's Facilities, whether directly or via application of the TPP, as applied to National Fuel, are preempted by the Utility Code.

### COUNT III - VIOLATION OF THE FIFTH AMENDMENT
### VIOLATION OF THE TAKINGS CLAUSE

134.    The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

135.    Ordinarily, fees imposed by the government do not constitute takings in violation of the Fifth Amendment. "It is beyond dispute that '[t]axes and user fees . . . are not takings.'" *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 597 (2013).

136.    The exception to this general principle is when the fee imposed is unreasonable: "a reasonable user fee is not a taking if it is imposed for the reimbursement of the cost of government services." *United States v. Sperry Corp.*, 493 U.S. 52, 63 (1989).

137.    Thus, "user fees are not takings under the Fifth Amendment unless the fees are so excessive that they do not reflect a 'fair approximation of the cost of benefits supplied' by the government." *In re Exide Techs.*, 611 B.R. 21, 32 (Bankr. D. Del. 2020), quoting *Massachusetts v. United States*, 435 U.S. 444, 463 n.19 (1978).

138.    When the government has engaged in a taking through the imposition of unreasonable fees, the injured party may immediately seek recourse by filing an action pursuant to 42 U.S.C. § 1983. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2168 (2019)(Holding that a "property owner has suffered a violation of his Fifth Amendment rights when the government takes his property without just compensation, and therefore may bring his claim in federal court under § 1983 at that time.")

139.    Pursuant to the Street Excavation Ordinance, the City of Erie has created and implemented a Fee Structure (consisting of Degradation, Inspection, and Permit Fees) which imposes unreasonable and excessive fees on National Fuel.

140.    The City of Erie's Fee Structure is completely unrelated to the "fair approximation of the benefits supplied" – a requirement for valid municipal fees pursuant to Pennsylvania law. In this regard, it is significant to note that the Fees collected pursuant to the Street Excavation Ordinance are applied to the City's General Fund, where they can be used for *any* purpose which can be paid from the same.

141.    Moreover, as noted at length above, National Fuel's excavation work does not "degrade" the areas of the Cartway which it excavates, obviating any need or justification for a Degradation Fee.

142.    Particularly telling, as well, is the fact that the Degradation Fees, while purportedly designed – per the express language of the Street Excavation Ordinance – to account for "degradation" incurred in connection with excavation done in the Cartway (*i.e.*, road) is nevertheless assessed for work done in both the Cartway and Utility Strip (*i.e.*, the sidewalk and the grassy area between the road and the sidewalk).

143.    As a result, via the Street Excavation Ordinance's Fee Structure, the City of Erie has unlawfully and unjustly taken approximately $1,300,000 from 2014 through 2020.

144.    The City of Erie continues to impose Fees on National Fuel pursuant to the Street Excavation Ordinance.

WHEREFORE, Plaintiff National Fuel Gas Distribution Corporation respectfully requests that this Honorable Court enter judgment in its favor and against the City of Erie in an amount in excess of $75,000.00, that it enjoin the City of Erie from imposing unreasonable and excessive fees against National Fuel in the future, that it award reasonable attorneys fees and that it order any other applicable relief.

## COUNT IV - VIOLATION OF THE FOURTEENTH AMENDMENT DUE PROCESS CLAUSE

145.    The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

146.    The Fourteenth Amendment states in pertinent part that no state may "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

147.    "Under the Fourteenth Amendment, a state may not authorize the deprivation of a protected liberty or property interest without providing a procedure in connection with that

deprivation that meets the requirements of due process." *Sample v. Diecks*, 885 F.2d 1099, 1114 (3d Cir. 1989).

148.    In order to state a cognizable claim under 42 U.S.C. § 1983 for violation of the right to procedural due process, a Complaint "must allege that (1) [the plaintiff] was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to [the plaintiff] did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).

149.    "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill,* 105 S.Ct. 1487, 1495 (1985)("An essential principle of due process is that a deprivation of . . . property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'") (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 70 S.Ct. 652, 656 (1950)).

150.    Importantly, "[t]he hearing required by the due process clause is not a moot court exercise. The hearing tribunal must have the authority to afford relief." *Clark v. Cohen*, 794F. 2d 79, 86 (3d Cir. 1986).

151.    The United States Supreme Court has recognized that state law can confer rights which require Fourteenth Amendment protection. *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)("we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause").

152.    National Fuel has an independent and vested property interest in access and use of public rights-of-way, pursuant to Section 1511(e) of the BCL (15 Pa.C.S. § 1511(e)), which states that a Public Utility "shall have the right to enter upon and occupy streets, highways,

waters and other public ways and places for... the placement, maintenance and removal of aerial, surface and subsurface Public Utility facilities thereon or therein."

153.    Moreover, National Fuel has the right to be free from regulation of the placement of its Facilities by municipal actors like the City of Erie by virtue of its status as a Public Utility. *See*, *PPL Elec. Utils. Corp. v. City of Lancaster*, 214 A.3d 639, 656 (Pa. 2019).

154.    The City of Erie is preempted from profiting from National Fuel's construction and maintenance work in Public ROWs, including by virtue of: (a) the Utility Code which vests complete authority to regulate Public Utilities with the PUC; (b) by Section 1511(e) of the BCL; and (c) established principles of Pennsylvania municipal law.

155.    The City of Erie, acting under color of state law, violated National Fuel's right to be free from municipal interference in the location of its Facilities.

156.    Specifically, the City of Erie has enforced the TPP, authored by the un-elected Urban Forest Committee, as if it was a duly-adopted municipal ordinance, and attempted to dictate and control the location of National Fuel's Facilities.

157.    National Fuel was neither afforded the opportunity to provide comment on the TPP nor was it even provided notice of the proposed adoption of the same (both when the TPP was first published in 2011 and again when the City incorporated it as a condition for issuing Permits under the Street Excavation Ordinance).

158.    Moreover, the City of Erie has not established a process by which National Fuel may seek an exemption, as a Public Utility, from the TPP (including as imposed now as a condition of the issuance of a Permit pursuant to the City's Street Excavation Ordinance).

159.    Just as bad, the City of Erie has not identified or established any person or office with the authority to exempt National Fuel from the TPP; thus, National Fuel has been denied the opportunity to be heard by the "decision-maker" on this issue.

160.    As a consequence, National Fuel has been substantially deprived of its statutorily-granted property interest to occupy the Public ROWs within the City of Erie, due to the City's unlawful enforcement of the TPP/Street Excavation Ordinance and imposition of the Fees imposed by the Street Excavation Ordinance, without due process of law.

161.    Additionally, National Fuel has been deprived of its right to determine the location of its Facilities, without recourse to any process established by the City of Erie to obtain an exemption from the City's TPP, again, without due process of law.

162.    To be clear: both in the adoption of the TPP/the Street Excavation Ordinance and through the enforcement of same, National Fuel has been denied its right to receive procedural due process before the City of Erie, which has summarily abrogated its statutory rights conferred on it by the Pennsylvania General Assembly under both Section 1511(e) of the BCL and the Utility Code.

WHEREFORE, Plaintiff National Fuel Gas Distribution Corporation respectfully requests that this Honorable Court enter judgment in its favor and against the City of Erie in an amount in excess of $75,000.00, that it enjoin the City of Erie from  imposing restrictions on the location of utility Facilities in the future, that it award reasonable attorneys fees and that it order any other applicable relief.

## COUNT V - VIOLATION OF THE FIRST AMENDMENT
## RETALIATION

163.    The averments in the preceding paragraphs are incorporated by reference, as if set forth in full herein.

164.    The First Amendment to the United States Constitution guarantees the right to free speech, among other fundamental freedoms. *See* U.S. Const. Amend. I.

165.    "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right . . . Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Bartley v. Taylor*, 25 F. Supp. 3d 521, 529-30 (M.D. Pa. 2014)(internal citations omitted).

166.    "Because government retaliation tends to chill an individual's exercise of his First Amendment rights, public officials may not, as a general rule, respond to an individual's protected activity with conduct or speech even though that conduct or speech would otherwise be a lawful exercise of public authority." *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 415-416 (4th Cir. 2006), *citing Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).

167.    "To set forth a prima facie case of retaliation in violation of the First Amendment, plaintiff must allege that: (1) she engaged in protected conduct; (2) defendants responded with retaliation; and (3) the protected conduct was the cause of the retaliation." *Montanye v. Wissachickon Sch. Dist.*, 2003 U.S. Dist. LEXIS 15570, at *21 (E.D. Pa. Aug. 11, 2003).

168.    In determining whether particular conduct "possesses sufficient communicative elements" to bring the First Amendment into play, the United States Supreme Court has inquired whether "an intent to convey a particularized message was present, and [whether] the likelihood

was great that the message would be understood by those who viewed it." *Texas v. Johnson,* 491 U.S. 397, 404 (1989).

169.    Here, National Fuel has repeatedly communicated to the City of Erie, both in writing and in person, that pursuant to established Pennsylvania law, the City of Erie has no authority to dictate, determine, or control the location and placement of National Fuel's Facilities – including under and pursuant to the TPP or other municipal action.

170.    In response to National Fuel's communication of the foregoing, the City of Erie initiated a series of increasingly aggressive retaliatory measures, including, among other things, the following:

    c.  First, the City of Erie ended its process of collegially granting National Fuel the Permits required pursuant to the Street Excavation Ordinance during or after the pendency of the work, by requiring that all work be permitted prior to initiation.

    d.  When this retaliatory action failed to have its desired effect (*i.e.*, National Fuel ceding its authority to determine the location of its Facilities), the City of Erie increased its pressure on National Fuel by imposing additional requirements to the Permit application process.

    e.  In particular, the City of Erie began demanding that National Fuel redesign its engineering and construction plans to relocate utility work away from any trees growing along City streets, and then resubmit revised permit applications for review by explicitly imposing compliance with the TPP as a condition of the issuance of a Permit under the Street Excavation Ordinance.

f.  National Fuel attempted to comply with these additional requirements, while continuing to insist that under Pennsylvania law, the City of Erie lacked authority to deny National Fuel access to public rights of way, for the purpose of constructing and maintaining its Facilities.

g.  In response, the City of Erie once again escalated its retaliation by, on various occasions, flatly refusing to issue Permits to National Fuel.

h.  On July 14, 2020, City of Erie Assistant Solicitor Doyle advised National Fuel that the permit would only be issued if National Fuel agreed to meet to discuss "National Fuel's comprehensive plan of its next projects within the City of Erie," a clear indication that the City of Erie intended to put pressure on National Fuel to adjust its upcoming projects to fit the City of Erie's wishes.

i.  In closing, Assistant Solicitor Doyle reiterated that "the City is not waiving any objection to future inadequate permits," a clear threat that if National Fuel refused to capitulate to the City of Erie's demands, it would once again refuse to issue the Permits necessary for National Fuel to work in the Public ROW.

j.  Since then, the City of Erie has issued "Stop Work" orders for various projects within the City of Erie, in apparent retaliation for National Fuel's ongoing assertion that it is not bound by the TPP.

171.  This retaliation has delayed, disrupted, and resulted in additional operational costs/ expenses related to the necessary construction and maintenance work which National Fuel must undertake to ensure that natural gas is safely and effectively provided to its ratepayers and has resulted in increased operational costs and burdens.

WHEREFORE, Plaintiff National Fuel Gas Distribution Corporation respectfully requests that this Honorable Court enter judgment in its favor and against the City of Erie in an amount in excess of $75,000.00, that it award reasonable attorneys fees and that it order any other applicable relief.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph P. Caulfield
PA Bar No. 32823
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
(814) 454-3889

*Attorneys for the Plaintiff*